

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.  Criminal No. 3:13cr172-01

MARVIN LEON CLAIR,

Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the parties' supplemental pleadings on sentencing in accordance with the Court's December 5, 2014 Order. For the reasons set forth herein, the Government's loss and gross receipts calculation methods will be adopted for the Defendant's sentencing hearing.

## FACTUAL BACKGROUND

Marvin Leon Clair pled guilty on September 10, 2014, with a plea agreement, to Conspiracy to Commit Mail Fraud, Wire Fraud, and Make False Statements to FDIC-Insured Institutions, in violation of 18 U.S.C. § 371. By providing false information to financial institutions during the mortgage loan application process, the Defendant qualified for loans that he might not have otherwise received. When he defaulted on his loans, the banks were left to recover whatever collateral value they could through foreclosure sales. The losses to the financial institutions were compounded by the downturn in the housing

market, which reduced the value of the collateral well below the outstanding principal still due on the loans.

Under the United States Sentencing Guidelines ("USSG" or "Guidelines"), the recommended sentence for offenses involving fraud or deceit depends heavily upon the amount of loss attributable to the crime. In addition, there is an enhancement available when the defendant derives more than $1,000,000 in gross receipts from financial institutions as a result of the offense.

On December 5, 2014, this Court requested briefing on the propriety of the calculation methods employed by the Government for determining loss and gross receipts under the Guidelines in such mortgage fraud cases. This opinion resolves those questions ahead of the Defendant's sentencing hearing.

## DISCUSSION

### I. Mortgage Fraud Loss Calculation under USSG § 2B1.1(b)(1)

Under USSG § 2B1.1(b)(1), the offense level attributable to the defendant's acts varies by the amount of loss caused by the offense. Generally, this loss is determined to be the greater of the intended loss or the "actual loss." See USSG § 2B1.1, cmt n. 3(A). Although the meaning of "intended loss" is rather self-evident, the term "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG § 2B1.1, cmt n. 3(A)(i). To be "reasonably

2

foreseeable," the harm must be harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG § 2B1.1, cmt n. 3(A)(iv). In cases of fraud involving collateral pledged by the defendant, the amount of "actual loss" should be offset by the amount recovered from the sale of the collateral. See USSG § 2B1.1, cmt n. 3(E)(ii). Unlike the initial determination of "actual loss," which requires that the losses be reasonably foreseeable, the "credits against loss" provision does not require that the amount recovered from the sale of the collateral be reasonably foreseeable. See United States v. Mallory, 709 F. Supp. 2d 455, 458 (E.D. Va. 2010) aff'd, 461 F. App'x 352 (4th Cir. 2012).

As the court in Mallory explained:

> Taken together, these provisions teach a two-step approach for calculating the loss attributable to a defendant in home loan fraud cases such as this one. The first step is to calculate the reasonably foreseeable pecuniary harm resulting from the fraud. This amount will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable "potential result of the offense" within the meaning of Application Note 3(A)(iv). After all, the entire purpose of loan qualification criteria is to reduce the risk to banks that debtors will default on their loans. . . . Partial recovery of this loss through seizure and sale of collateral may reduce the net loss amount through operation of the

3

> "credits against loss" provision, but it does not diminish the foreseeability of the financial institutions' loss of the unpaid principal amounts in the first instance.
>
> The second step in calculating the loss amount requires application of the "credits against loss" provision. In applying this provision, courts must deduct from the calculated loss the amount actually recovered or actually recoverable by the creditor from sale of the collateral. This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable by the defendant. Where the financial institutions have sold the collateral, courts should credit the amount actually recovered in the sale. Where the collateral is held by the institution at the time of sentencing, then the fair market value of the collateral at the time of sentencing is properly credited instead. By operation of Application Note 3(E)(ii), it is irrelevant whether the diminished value of the credit against loss was reasonably foreseeable to defendant, as the loss of the entire amount of unpaid principal was a reasonably foreseeable potential consequence of defendant's conduct. Accordingly, defendant is only entitled to a credit against loss in the amount actually recovered by the banks from sale of the subject properties.

Mallory, 709 F. Supp. 2d at 458-59. This Court finds the reasoning of Mallory persuasive. To be "reasonably foreseeable" under the Guidelines, the loss need not be the likely or probable aggregate outcome of the fraud, only an outcome the defendant "should have known . . . was a potential result of the offense." USSG § 2B1.1, cmt n. 3(A)(iv) (emphasis added). It

4

is reasonably foreseeable that the potential loss could be any amount up to the unpaid principal remaining on the loan. The Defendant need not - and indeed, could not - know the exact quantum of the final loss that would result at the time of the offense. However, the Defendant surely knew that the value of the underlying collateral could be diminished and that default would result in the loss of all unpaid principal.[1]

For this reason, it is inevitable that the loss calculation and restitution calculation would yield the same amount, despite the fact that reasonable foreseeability is applicable only in the former case.[2] This is because the Defendant could not only reasonably foresee that the loss of any remaining unpaid

---

[1] Although the Guidelines set punishment by quantum and the exact quantum of the loss is admittedly unknowable to the Defendant at the time of the offense, the Defendant knew the range of potential losses attributable to his actions and is therefore liable for whatever final quantum falls within that range. Notably, the rule defines "actual loss" as the reasonably foreseeable pecuniary harm "that resulted from the offense." To determine that amount, the Court starts with whatever quantum in fact "resulted from the offense" and then determines whether that quantum was reasonably foreseeable (and cabins it to the extent the amount was not reasonably foreseeable). The rule does not require the Court to establish a fixed quantum foreseeable at the time of the offense and set the amount of loss equal to this prediction regardless of what losses actually resulted from the offense.

[2] Compare USSG § 2B1.1, cmt n. 3(A)(i) ("'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense.") with USSG § 5E1.1(a)(1) ("In the case of an identifiable victim, the court shall enter a restitution order for the full amount of the victim's loss[.]").

5

principal - whatever the quantum - was a potential result of the offense, but because the loss of unpaid principal will, in all likelihood, <u>always</u> be the result of such an offense. The restitution owed will, by virtue of the pledged collateral, be reduced by the actual sales price received by the financial institution disposing of the collateral, and an offset in the exact amount of this later, unpredictable collateral sale value is precisely what the credit against loss provision provides for the loss calculation. This unflinching accounting does not read reasonable foreseeability out of the loss calculation because the loss of principal is what any loan applicant could reasonably expect to be a consequence of default.[3]

Clair lied on loan applications about his income, which is clearly a factor relevant to his ability to repay the loans. <u>See, e.g.</u>, Presentence Investigation Report [hereinafter, "PSR"] (Docket No. 154) ¶¶ 20(11)-(14) & 20(18)-(19). As the Government observes, these statements were not slight inflations

---

[3] Because the loss of unpaid principal is reasonably foreseeable to a defendant regardless of the type of fraud perpetrated, the Government is correct to note that such distinctions do not work any difference with respect to the loss calculation formula itself. However, it is obvious that fraud regarding the defendant's ability to meet all loan payment obligations and fraud regarding the value of the underlying collateral are qualitatively different kinds of fraud posing qualitatively different kinds of risks to the loan's counterparty. The egregiousness of the fraud and the seriousness of the risk posed to the counterparty are clearly among the factors the Court should consider in its ultimate sentencing decision.

of his income, they were wholesale fabrications. In addition, many of the fraudulent transactions also involved misrepresentations about the value of the collateral. See, e.g., PSR (Docket No. 154) ¶ 20(20)-(26).

Because of these misrepresentations, the foreseeable loss was the unpaid principal on the loan. This is a "potential" result of the Defendant's fraud. The harshness of this rule is mitigated (and complemented) by the credits against loss provision; however, the Court recognizes that application of the Guidelines may, in some instances, result in sentence recommendations that fail to serve the ends of 18 U.S.C. § 3553(a). Indeed, there is something inherently troubling about pegging the Defendant's prison term to the combined whims of the Case-Shiller index and the collateral sale timing – neither of which reflect in any way upon the Defendant's culpability. Although courts have observed that any other rule would "encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk," United States v. Turk, 626 F.3d 743, 750 (2d Cir. 2010), the rule adopted eliminates the moral hazard but leaves the gamble intact. In other words, a defendant who engaged in the same fraudulent behavior with the same loan amount could walk away with a negligible term of incarceration based on the same roll of the dice. Providing significantly

7

different prison terms for essentially identical behavior could hardly be considered "just."

The solution, however, is not to avoid individualized instances of injustice by imposing a tortured interpretation of the Guidelines. Rather, because the Guidelines are only advisory, the Court is already endowed with the power to modify the sentence prescribed in its discretion.

Although the government appropriately uses the value of the unpaid principal as the measure of foreseeable loss in such cases, the Guidelines recommendation will commonly act as an introduction - rather than a conclusion - to the Court's deliberations over a suitable term of incarceration. This is especially true where, as here, a strict interpretation of the rules could result in widely disparate sentences for similar conduct based solely on market forces unrelated to criminal culpability. If the Court is to assure that "defendants who fraudulently induce financial institutions . . . are responsible for the natural consequences of their fraudulent conduct," Mallory, 709 F. Supp. 2d at 459, then the Court must stand ready to not only curtail overly punitive Guidelines recommendations, but augment overly generous ones as well.

## II. Gross Receipts Calculation under USSG § 2B1.1(b)(16)

USSG §§ 2B1.1(b)(16)(A) & (D) provide for a two-point enhancement when a defendant derives more than $1,000,000 in gross proceeds from financial institutions as a result of the offense and further require an automatic increase in offense level to 24. Application of this enhancement requires that the defendant individually derive $1,000,000 in gross proceeds "obtained directly or indirectly as a result of such offense." USSG § 2B1.1, cmt. n. 12(B).

The Government has argued that the loan proceeds themselves count as gross receipts for calculation purposes, but that a variance resulting in non-application of the enhancement might be warranted where, as here, the "receipts" of the offense are used to purchase collateral legally subject to the defendant's continued debt obligations. As with the loss calculation method above, this appears to strike an appropriate balance. Gross receipts must be read broadly to avoid inadvertently substituting "net receipts" in its place. See e.g., United States v. Gharbi, 510 F.3d 550, 555 (5th Cir. 2007). Moreover, the Guidelines use expansive language that appears intended to cast as wide a conceptual net as possible. USSG § 2B1.1, cmt. n. 12(B) (defining "gross receipts" to include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of [the] offense"). Although

9

this definition reaches the instant offense, the application of the rule could be tempered on a case-by-case basis. The Court will determine the appropriate degree of variance, if any, at the Defendant's sentencing hearing.

## CONCLUSION

For the foregoing reasons, the Court holds that the Government's loss and gross receipts calculation methods are appropriate under the circumstances. The Court will consider all factors supporting a variance sentence at the Defendant's sentencing hearing.

It is so ORDERED.

/s/  REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 5, 2015

10